NICOLAS MORGAN (Bar No. 166441)
nicolas.morgan@dlapiper.com
JOSHUA BRIONES (Bar No. 205293)
joshua.briones@dlapiper.com
ANA TAGVORYAN (Bar No. 246536)
ana.tagvoryan@dlapiper.com
**DLA PIPER LLP (US)**
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6022
Tel: 310.595.3000
Fax: 310.595.3300

Attorneys for Plaintiff
ROBERT P. MOSIER

FILED
2011 MAR 30 AM 10:54
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.

VIA FAX

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ROBERT P. MOSIER as Receiver for PRIVATE EQUITY MANAGEMENT GROUP, INC. and PRIVATE EQUITY MANAGEMENT GROUP, LLC and their subsidiaries and affiliates,

Plaintiff,

v.

STONEFIELD JOSEPHSON, INC., CPAs, a California corporation; and DOES 1 – 10 inclusive,

Defendant.

Case No.: **CV11-02666 SVW (JEMx)**

**COMPLAINT FOR:**

**NEGLIGENCE;**

**AIDING AND ABETTING CONVERSION;**

**UNJUST ENRICHMENT**

Plaintiff Robert P. Mosier alleges as follows:

**INTRODUCTION**

1. Pang, the PEMGroup Management Team (identified below) and the PEMGroup Directors (identified below) established so-called "special purpose vehicle" ("SPV") entities in the British Virgin Islands which were affiliates of PEMGroup. Each SPV sold notes, and each such offering was referred to as a "fund" or a "Tranche." These SPV funds or Tranches were managed and controlled by Pang and the PEMGroup Management Team. They raised $951 million through a series of equity and debt offerings to various investors, of which at least $823 million has not been returned to the investors. Pang had effective control of and access to all the bank accounts into which investor funds were placed.

2. Commencing at least as early as July 2006, and continuing through at least April 2009, Pang and the PEMGroup Management Team formed and entered into an unlawful conspiracy and agreement to divert from the representations and promises made to investors in the offering materials and through other means. For example, PEMGroup represented to investors that it would use investor funds for the purpose of purchasing life insurance policies from senior citizens at a discount to the face value of the policies, and to invest in timeshare-related assets. PEMGroup represented that both principal and interest were insured and "guaranteed." PEMGroup made at least four material misrepresentations to investors: (1) the source of the purported returns was claimed to be profits generated by their investments in life insurance policies and timeshare real estate, when, in fact, some of the purported returns were paid out of funds raised from subsequent investors; (2) in at least one instance, PEMGroup presented investors with a forged insurance policy in which the coverage amount had been altered from $31 million to $108 million to support a false claim that a particular investment was entirely covered by insurance; (3) PEMGroup misrepresented the educational and employment history of Danny Pang ("Pang"), PEMGroup's chairman, by falsely

claiming that he had received bachelor's and master of business administration degrees and that he had worked at the well-known brokerage house, Morgan Stanley; and (4) PEMGroup misappropriated millions of dollars of investor funds on extravagant purchases, such as the purchase of private aircraft, lavish operating expenses, and personal loans that were never disclosed to investors. These misrepresentations are currently the subject of a lawsuit initiated by the United States Securities and Exchange Commission ("SEC") in this Court.

3. In addition, Pang and the PEMGroup Management Team conspired to and did loot PEMGroup and its affiliates by using the proceeds of various offerings for a variety of illicit and undisclosed purposes, which included but were not limited to: (1) the purchase of impaired life insurance policies from earlier Tranches at above fair market values; (2) millions of dollars in loans and excessive fees and commissions to PEMGroup to fund the company's exorbitant operating expenses; (3) millions of dollars in unsecured and undocumented personal "loans" to Pang; (4) over $107 million of excessive compensation, fees, commissions and bonuses to Pang and the PEMGroup Management Team; and (5) hundreds of millions of dollars in loans and investments in high risk nonconforming assets never disclosed in the offering documents, most of which became substantially impaired. None of these uses and/or misappropriations of funds were disclosed to the investors. This looting activity injured PEMGroup and the SPVs, rendering them unable to pay their debts or offer the promised rates of return to the investors.

4. As a further purpose of the conspiracy, Pang and the PEMGroup Management Team conspired and agreed to distribute false and misleading Net Asset Value ("NAV") Reports. Collectively, it was their intention to induce investors into maintaining their investments in the notes, bonds and other forms of preferred stock offered by PEMGroup and the Tranches, by lulling them into a false

sense of security. Ultimately, the conspiracy resulted in a diversion and misappropriation of investor funds for improper and unlawful purposes and the concealment of the diversion and misappropriation of the funds from investors.

5. Stonefield Josephson, Inc., assisted, encouraged and furthered the fraudulent scheme by Pang and the PEMGroup Management Team by preparing and distributing false and misleading audit reports, which induced investors to purchase shares and maintain their investments in notes, bonds and other forms of debt offered by PEMGroup and the Tranches, and lulled them into a false sense of security. This allowed Pang and the PEMGroup Management Team to divert and misappropriate those funds for improper and unlawful purposes, and then to conceal the diversion and misappropriation of the funds.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 754.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because certain of the transactions, acts, practices and causes of conduct occurred within this District and the Plaintiff Robert P. Mosier was appointed receiver in this district.

**RECEIVER STANDING**

8. Mr. Mosier has standing to bring this action pursuant to 28 U.S.C. § 754, which provides: "A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof. He shall have capacity to sue in any district without ancillary appointment."

## PARTIES

9. Plaintiff Robert P. Mosier ("Plaintiff" or "Mr. Mosier") is a citizen of California. He was appointed as permanent receiver of Private Equity Management Group, Inc. ("PEMG, Inc."), a Nevada corporation with its principal place of business in Irving, California and Private Equity Management Group, LLC ("PEMG, LLC"), a Nevada limited liability company with its principal place of business in California (collectively "PEMGroup") and their subsidiaries and affiliates, with full powers of an equity receiver, including, but not limited to, full power over all funds, assets, collateral, premises (whether owned, leased, occupied, or otherwise controlled), choses in action, books, records, papers and other real or personal property, including notes, deeds of trust and other interests in real property, belonging to, being managed by, or in the possession of or control of PEMGroup, and their subsidiaries and affiliates.

10. PEMG, Inc. offered and sold securities issued by various entities and affiliates it controlled. Pang, as its president and a director, controlled and directed the actions and operations of this entity. PEMG, Inc. directed the tranches to invest in life insurance policies and interests in timeshare-related assets.

11. PEMG, LLC is a Nevada limited liability company located in Irvine, California. Pang, as a managing member, controlled and directed the actions and operations of this entity. PEMG, LLC took equity positions in certain investments made by PEMG, Inc.

12. Danny Pang was one of the founders and the president and a director of PEMG, Inc. Pang was also a managing member of PEMG, LLC.

13. Defendant Stonefield Josephson, Inc., CPAs ("Defendant" or "Stonefield"), was, at the time of events set forth herein and alleged in the preceding paragraphs, a California corporation, with its principal place of business in Los Angeles, California. On October 1, 2010, Stonefield Josephson merged with Marcum LLP and has taken on the name MarcumStonefield, a division of Marcum.

Stonefield was an accounting and business consulting firm that offers auditing, tax, and advisory services to its clients. Stonefield served as the auditor for at least one of PEMGroup's SPVs, as described below, and in that capacity issued various audit reports for the various Tranches.

**OTHER PERSONS**

14. The PEMGroup Management Team consisted of Danny Pang (Director, Chairman, Chief Operating Officer), Leon Chan (Director, Co-President), Robert Anderson (Director, Chief Operating Officer, Co-President), Nasar Aboubakare (Director, Former President,Chief Investment Officer), Steven Blair (Managing Director and General Counsel), Todd Gillespie (Senior managing Director), Wilbur Quon (Managing Director, CFO), Peter Paul Mendel (Director, Chief Compliance Officer, Former General Counsel), Anthony Bufinsky (Managing Director), Sandra Chang (Managing Director), Andrew Shayne (Managing Director, Chief Investment Officer), Eric Sloane (Managing Director), and Robert Van Duren (Managing Director).

15. The PEMGroup Directors consisted of Danny Pang, Robert J. Anderson, Wilbur Quon, Todd D. Gillespie, Peter Paul Mendel, Leon Chan, Sandra Chang, Anthony Bufinsky and, at various times, Nasar Aboubakare. The PEMGroup Directors, in whole or in part, also served as the Directors of the PEMGroup subsidiaries and affiliates described herein.

16. While the offerings for the Tranches and funds that occurred in 2003 to early 2005 involved preferred shares, the offerings from November 2005 through September 2008, involved exclusively debt instruments, such as bonds and promissory notes. These offerings were made by SPVs named Genesis Voyager Equity Corporation ("GVEC"); GVEC Resource, Inc. ("GVECR"); Genesis Voyager Equity II Corporation ("GVEC II"); GVEC Resource II, Inc. ("GVECR II"); GVEC Resource III, Inc. ("GVECR III"); and GVEC Resource IV,

Inc. ("GVECR IV"); all of which were owned and controlled by PEMGroup affiliates and controlled ultimately by Pang and PEMGroup. The Tranches, date established, amount invested, and the investors were:

a. GVEC Preferred Shares, October 31, 2003, $11,770,000.00, 55 individual investors;

b. GVEC Preferred Shares A, February 2, 2004, $31,340,000.00, various individual investors and Bank SinoPac;

c. GVEC Notes A, June 28, 2004, $5,900,000.00, six individual investors;

d. GVEC Preferred Shares Bl, April 25, 2005, $15,730,000.00, Truswell Securities Investment Trust plus 42 individual investors;

e. GVEC PS C1 July 1, 2005, $3,090,000.00, 16 individual investors;

f. GVEC PS D1 #2, July 18, 2005, $60,000,000.00, Bank SinoPac;

g. GVECR Al Notes, November 15, 2005, $5,000,000.00, IIT, Hi Bank;

h. GVECR A2, Notes, November 15, 2005, $3,000,000.00, IIT;

i. GVECR A3, Notes, November 15, 2005, $2,114,100.00, IIT;

j. GVECR C1 Notes, November 15, 2005, $1,000,000.00, IIT;

k. GVECR C2 Notes, November 15, 2005, $934,700.00, IIT;

l. GVECR D1 Notes, November 15, 2005, $1,000,000.00, IIT;

m. GVECR D2 Notes, November 15, 2005, $1,493,800.00, IIT;

n. GVECR E1 Notes, November 15, 2005, $2,500,000.00, IIT;

o. GVECR E2 Notes, November 15, 2005, $2,472,500.00, IIT;

p. GVECR B Notes, January 2, 2006, $5,000,000.00, Coretech;

q. GVECR F1 Notes, March 21, 2006, $4,500,000.00, Truswell Securities Investment Trust;

r. GVECR IV Notes A, July 26, 2006, $75,120,000.00, Standard Chartered Bank Taiwan Ltd. formerly known as Hsinchu International Bank;

s. GVEC II CDO Series 2006, August 1, 2006, $32,000,000.00, Bank SinoPac;

t. GVEC II Debentures Series 2006-A, October 10, 2006, $55,000,000.00, Bank SinoPac;

u. GVECR IV Notes C, December 7, 2006, $100,050,000.00, Standard Chartered Bank Taiwan Ltd. formerly known as Hsinchu International Bank;

v. GVECR IV Notes D, December 28, 2006, $79,960,000.00, Standard Chartered Bank Taiwan Ltd. formerly known as Hsinchu International Bank;

w. GVECR II Debentures Series 2006-A-1, January 1, 2007, $5,000,000.00, Hua Nan Investment Trust Corporation;

x. GVECR II Debentures Series 2006-A-2, January 1, 2007, $5,000,000.00, Hua Nan Investment Trust Corporation;

y. GVECR II Debentures Series 2006-A-3, January 1, 2007, $5,000,000.00, Hua Nan Investment Trust Corporation;

z. GVECR II Debentures Series 2006-A-4, January 1, 2007, $5,000,000.00, Hua Nan Investment Trust Corporation;

aa. GVECR II Debentures Series 2006-A-5, January 1, 2007, $2,460,000.00, Hua Nan Investment Trust Corporation;

bb. GVECR III Notes - Series 2007 A-4, April 2, 2007, $16,870,000.00, Cosmos Bank, EnTie Bank;

cc. GVECR II Debentures Series 2007 A, May 9, 2007, $12,560,000.00, Hua Nan Commercial Bank Ltd. Trust Dept.;

dd. GVECR II Debentures Series 2007 B, July 2, 2007, $22,190,000.00, Cosmos Bank, Hua Nan Commercial Bank Ltd. Trust Dept.;

ee. GVECR II Debentures Series 2007 C, September 3, 2007, $115,840,000.00, Cosmos Bank, EnTie Bank, Hua Nan Commercial Bank Ltd. Trust Dept.;

ff. GVECR II Debentures Series 2007 D, November 1, 2007, $15,550,000.00, Cosmos Bank, EnTie Bank;

gg. GVECR II Debentures Series 2007 E, December 17, 2007, $56,350,000.00, Cosmos Bank, Hua Nan Commercial Bank Ltd. Trust Dept.;

hh. GVECR II Debentures Series 2008 B, February 4, 2008, $45,170,000.00, Hua Nan Commercial Bank Ltd. Trust Dept.;

ii. GVECR II Debentures Series 2008 C, February 4, 2008, $11,900,000.00, Cosmos Bank, Hua Nan Commercial Bank Ltd. Trust Dept.;

jj. GVECR II Debentures Series 2008 Al, March 7, 2008, $6,000,000.00, Hua Nan Investment Trust Corporation;

kk. GVECR II Debentures Series 2008 A2, March 7, 2008, $6,000,000.00, Hua Nan Investment Trust Corporation;

ll. GVECR II Debentures Series 2008 A3, March 7, 2008, $6,000,000.00, Hua Nan Investment Trust Corporation;

mm. GVECR II Debentures Series 2008 A4, March 7, 2008, $6,000,000.00, Hua Nan Investment Trust Corporation;

nn. GVECR II Debentures Series 2008 A5, March 7, 2008, $6,616,225.00, Hua Nan Investment Trust Corporation;

oo. GVECR II Debentures Series 2008 E, April 30, 2008, $33,341,000.00, EnTie Bank, Taichung Bank;

pp. GVECR II Debentures Series 2008 G, May 30, 2008, $18,860,000.00, EnTie Bank, Taichung Bank;

qq. GVECR II Debentures Series 2008 I, July 2, 2008, $14,533,000.00, Taichung Bank;

rr. GVECR II Debentures Series 2008 H-6, July 31, 2008, $12,380,000.00, Taichung Bank;

ss. GVECR II Debentures Series 2008 H-7, July 31, 2008, $8,500,000.00, Coretech; and

tt. GVECR II Debentures Series 2008 J, September 3, 2008, $15,621,000.00, Taichung Bank.

17. PEMGroup subsidiaries and affiliates include GVEC, GVEC Resource, Inc.; GVEC Resource II, Inc.; GVEC Resource III, Inc.; GVEC Resource IV, Inc.; GVEC Resource V, Inc.; GVEC Resource VI, Inc.; GVEC Acquisitions, Inc.; Genesis Voyager Equity II Corporation; Genesis Voyager Assets Management Ltd.; Genesis Voyager Equity Corporate Resources I, Inc.; GVEC Investments Corporation; Epoch Investment Holding Corporation; Fides Insurance Company, Ltd.; Irvine Insurance Company (BVI), Ltd.; Equity Resource Management (BVI), Ltd.; ERM Resource, Ltd.; Dominical Holdings, LLC; Jorei Enterprises, LLC; Irvine Capital Holdings, LLC; and Zhongguo Investments Corporation.

**THE OFFERINGS**

18. Since at least 2003 and continuing through September 2008, Pang, the PEMGroup Management Team and the SPVs offered and sold preferred shares, notes and bonds and other forms of debt and purported to use the proceeds to purchase and/or finance the maintenance of life insurance policies issued to purportedly high net worth individuals, and/or to invest in timeshare related assets and potentially other assets. Pang, the PEMGroup Management Team and the SPVs offered and sold securities promising rates of return between 5.25% to 7.55%, paid semi-annually or annually. The offerings for 2003 through July 2005 included preferred shares, while the offerings from November 2005 through September 2008 were exclusively debt offerings including notes, bonds and other forms of debt.

19. In connection with each of the offerings, on behalf of the Tranches, Pang and the PEMGroup Management Team prepared and delivered to investors Confidential Preliminary Private Offering Memoranda ("CPPOMs") and Confidential Private Offering Memoranda ("CPOMs") that, among other things, represented to investors how their funds would be used.

20. Between 2004 and 2005, Pang and the PEMGroup Management Team conducted several offerings to raise money for the SPV called Genesis Voyager Equity Corporation ("GVEC"), which is an international investment company incorporated in the British Virgin Islands. The GVEC offerings were conducted in six Tranches. The funds raised in the GVEC offerings were used to purchase life insurance policies and subordinated commercial mortgages in real estate projects, all of which were referred to as "Special Assets" or "Value Assets". In return for their investments in the GVEC offerings, investors were promised annual interest payments of between approximately 6% and 7.1%, which were payable semiannually, as well as the return of their principal upon maturity. Investors were also told that the assets would be insured by high grade insurance institutions. GVEC was used by PEMGroup as a conduit for the investment of investors' funds.

**MISUSE, DIVERSION AND MISAPPROPRIATION OF FUNDS**

21. Contrary to the explicit language in the CPPOMs and/or CPOMs regarding use of offering proceeds, starting at least as early as July 2006, Pang and the PEMGroup Management Team actually used the proceeds of various offerings for a variety of illicit and undisclosed purposes, which, as described above, included the purchase and sale of impaired life insurance policies from and to earlier Tranches. These inter-Tranche transactions were improper for at least the following reasons: (1) the assets were sold and/or purchased at inflated prices, above fair value; (2) a conflict of interest existed in that the same Trustees, advisors, and management represented both the buying Tranche and the selling

Tranche; (3) the valuations of the assets were prepared by PEMGroup, and not by a third party; and (4) the transactions and use of funds did not conform to the offering materials of the Tranches involved.

22. Specifically, PEMGroup controlled and executed transfers and/or the sale of assets to and from GVEC. PEMGroup caused GVEC to sell some insurance policies to other PEMGroup affiliates in order to cover GVEC's overhead costs. For example, in early 2008, the PEMGroup Management Team intended to [and did] cause the GVEC Preferred Shares A portfolio to "retire" on its fourth anniversary to cover annual interest payments due on the portfolio as well as to cover monthly premiums due on the policies. The portfolio was "retired" by a sale to one of the other Tranches, GVECR II, at 68% of the face value of the life insurance policies, or approximately $33.32 million, which was the amount needed to retire the portfolio. A similar situation arose with GVEC Preferred Shares B1 when the annual interest payment was due in April 2008. In addition, cash was needed for premium payments on the policies in the GVEC Preferred Shares D1 Tranche in November 2008. As a result, the PEMGroup Management Team approved a sale of assets from the Tranche to GVECR II 2007 C for approximately 80% of their face value. None of these transfers conformed to the offering materials for the Tranches, nor were they ever approved by the investors. Instead, such transactions were made pursuant to the fraudulent scheme described above.

## DEFENDANT'S TORTIOUS CONDUCT

23. Beginning as early as August 2003, if not earlier, Stonefield was the independent auditor retained to audit the financial statements, statements of assets, liabilities and net assets, and related statements of operations and changes in net assets of GVEC and its Tranches. Each offering was separately audited. In its role, Stonefield was required to, and had the duty to, audit in accordance with auditing standards generally accepted in the United States, including planning and performing the audit to obtain reasonable assurance about whether the financial

statements were free of material misstatement. Among other things, Stonefield was required to examine evidence supporting the amounts and disclosures in the financial statements, and assess the accounting principles used and significant estimates (including fair market value) made by management.

24. In issuing its audit reports, Stonefield misrepresented, and failed to fully disclose, the inter-Tranche transfers discussed above. Stonefield knew, or with reasonable diligence should have known, that the inter-Tranche transfers were improper because, among other things, Stonefield reviewed the insurance policies (assets) that were the subjects of the sale, reviewed the sale and purchase agreements between the Tranches, and knew that the valuations of the policies were inaccurate because: (1) a conflict existed in that the same managers and advisors represented both the buying Tranche and the selling Tranche, and (2) GVEC did not provide a third-party valuation of the insurance policies. Stonefield also knew, or with reasonable diligence should have known, that the insurance policies were sold to affiliated Tranches at inflated values, as the return on the investments was significantly higher than the industry average, and, some of the insurance policies were sold for an amount close to the face value of the policies.

25. While Stonefield stated in the Notes to the financial statements for some of the Tranches (such as Preferred Shares A, Preferred Shares B1, and Preferred Shares D1) that the Tranche sold certain "Growth Added Value Assets" to an affiliate, it did not disclose any of the facts discussed above, although it knew that such information was material and the omission of such information rendered the "disclosures" misleading to investors and to others.

26. Moreover, Stonefield knew that GVEC, and by extension, PEMGroup, valued certain investments by a method not in accordance with accepted accounting principles and that the company did not make the disclosures required in the financial statements (such as the exact nature of their investments). While the PEMGroup Management Team attempted to mask its misappropriation of investor

funds and failing operations, Stonefield failed to follow the paper trails and other evidence to these improper transactions that, if properly analyzed, Stonefield should have revealed the company's impecunious condition and the fraudulent scheme.

27. By its conduct as alleged above, Stonefield assisted, encouraged and furthered the fraudulent scheme by Pang and the PEMGroup Management Team by preparing and distributing false and misleading audit reports which induced investors to purchase shares and maintain their investments in notes, bonds and other forms of debt offered by PEMGroup and the Tranches and lulled them into a false sense of security. This allowed Pang and the PEMGroup Management Team to divert and misappropriate those funds for improper and unlawful purposes, and then to conceal the diversion and misappropriation of the funds.

28. The false and misleading audit reports were a significant factor in concealing the frauds being perpetrated by Pang and the PEMGroup Management Team from the investors and others. Truthful audit reports would have revealed that Tranche and PEMGroup assets were being misappropriated and diverted in a ponzi scheme, that life insurance and timeshare assets were significantly impaired, and that hundreds of millions of Tranche and PEMGroup funds had been diverted and misapplied into unauthorized assets which were significantly impaired. Had the frauds been revealed earlier, they would have been stopped and investigated, preventing millions of dollars of additional losses.

29. In most instances, the value of the assets held by the SPVs had declined significantly after the date of the applicable offering. For instance, the entire market for life insurance assets was severely depressed between 2007 and 2008, and yet this was not reflected in the audit reports issued by Stonefield, nor taken into consideration when investigating the inter-Tranche transfers. Also, a number of the assets held by, and/or contained in, the SPVs had been misappropriated by Pang and PEMGroup. However, the resulting diminution in value of the affected Tranches was not reflected in the audit reports.

**PLAINTIFF'S DISCOVERY OF TORTIOUS CONDUCT**

30. Commencing in 2003 and continuing through April 24, 2009, PEMGroup and its affiliates were adversely dominated by the PEMGroup Management Team and the PEMGroup Directors, who were responsible in whole or in part for the injuries to PEMGroup and its affiliates. Specifically, all of the PEMGroup Directors adversely dominated PEMGroup and its affiliates throughout their terms as PEMGroup Directors. No independent, disinterested Director was appointed or participated in the control of PEMGroup and its affiliates.

31. On April 24, 2009 the United States Securities and Exchange Commission ("SEC") commenced an action against Pang, PEMG Inc., and PEMG LLC, seeking, among other relief, the entry of a temporary restraining order and the appointment of a receiver to take control of the entities and their assets.

32. On April 27, 2009 the Court entered an order appointing Mr. Mosier as temporary receiver and on July 2, 2009, the Court entered an order permanently appointing him as permanent receiver, vesting him with the authority set forth in paragraph 10.

33. Later, on July 2 and August 10, 2009 the Court entered supplemental orders placing additional affiliate entities under the authority of the receivership.

34. Mr. Mosier and a team of accounting, legal and other professionals immediately began marshalling the assets of PEMGroup and its affiliates, and reviewing and studying the books and records of the entities, relevant transactions, corporate expenditures, and sources and uses of funds.

35. Prior to this work, Plaintiff could not reasonably have discovered the value or the validity of the claims stated herein.

36. As a result of the adverse domination of PEMGroup and its affiliates by the PEMGroup Management Team and the PEMGroup Directors, neither PEMGroup or its affiliates discovered or reasonably could have discovered the facts giving rise to the claims for relief set forth herein during the period of adverse domination, which continued until the appointment of Mr. Mosier as an independent receiver.

## First Claim for Relief - Negligence

37. Plaintiff hereby incorporates and repeats by reference the allegations in the preceding paragraphs as if fully set forth herein.

38. As demonstrated above, Stonefield, who had contracted with PEMGroup for auditing and other services, owed a duty to PEMGroup and GVEC to conduct an audit of the company's financial statements using the care and diligence recognized and accepted in the industry.

39. However, the audits for the GVEC Tranches were negligently prepared because the Tranche's financial statements contained material misstatements and omissions, and failed to portray the true value of the Tranche's assets or their true financial condition.

40. Stonefield knew, should have known, or was reckless in not knowing that its "disclosures" and qualified opinions about the company's departure from generally accepted accounting principles and inter-Tranche transfers was not adequate because, at a minimum, Stonefield failed to disclose (1) a conflict existed in that the same managers and advisors represented both the buying and the selling Tranche; (2) the Tranche's reported values of its investments and sold assets were materially overstated; and (3) there was no disclosure in the financial statements of management's failure to comply with the Tranche's stated investment objectives and policies. Had Stonefield exercised appropriate due care in the conduct of its

audits, it would have recognized the company's departures from its stated investment policy and strategy, and would have discovered and/or disclosed the improper inter-Tranche transfers that occurred.

41. Accordingly, Stonefield breached its duty to use due professional care and to obtain sufficient competent evidence in support of its auditing opinions, and to make the appropriate disclosures in the audit reports.

42. Stonefield's failure to exercise due care and perform in accordance with the recognized and accepted professional standards for auditors directly and proximately caused damages to PEMGroup and its affiliates in an amount to be proven at trial.

**Second Claim for Relief – Aiding and Abetting Conversion**

43. Plaintiff hereby incorporates and repeats by reference the allegations in the preceding paragraphs as if fully set forth herein.

44. As set forth above, Pang and the PEMGroup Management Team solicited investors to invest in PEMGroup and the Tranches for the purpose of purchasing specific assets, including life insurance and time-share related assets.

45. When PEMGroup received the offering proceeds on behalf of the SPVs and Tranches, Pang and the PEMGroup Management Team converted the offering proceeds and failed to use the offering proceeds as promised. More specifically, Pang and the PEMGroup Management Team used a substantial portion of the offering proceeds to purchase impaired life insurance policies from earlier SPV Tranches (such as GVEC Preferred Shares A, GVEC Preferred Shares B1, and GVEC Preferred Shares D1), and misapplied and diverted the offering proceeds into improper, unauthorized and imprudent loans and investments not in accordance with the uses of funds set forth in the offering materials.

46. By virtue of the foregoing conduct, Pang and the PEMGroup Management Team have intentionally, unlawfully, and wrongfully deprived PEMGroup and the SPV Tranches they controlled of the funds to purchase the promised assets, thereby seriously interfering with PEMGroup's and the SPV Tranches' ability to pay their debts.

47. Stonefield knowingly and/or recklessly and substantially aided and abetted; assisted; encouraged; conspired with; authorized; and/or requested, ratified or recklessly tolerated the statements and actions of co-conspirators Pang and the PEMGroup Management Team by assisting Pang and the PEMGroup Management Team in issuing false and misleading audit reports. These actions allowed Pang and the PEMGroup Management Team to convert the funds that should have been used to purchase the promised assets.

48. As a direct and proximate cause of the conduct of Stonefield, PEMGroup has sustained damages in an amount to be proven at trial.

**Third Claim for Relief – Unjust Enrichment**

49. Plaintiff hereby incorporates and repeats by reference the allegations in the preceding paragraphs as if fully set forth herein.

50. Stonefield received compensation for services it rendered in a negligent and reckless manner that caused damage to PEMGroup. Accordingly, Stonefield, by its wrongful acts, received a benefit and is unjustly retaining such benefit at the expense of PEMGroup.

51. As described above, the circumstances are such that, as between Stonefield and PEMGroup, it is unjust for Stonefield to retain any benefit from its negligent services. As such, Stonefield is required to make restitution to Plaintiff.

//

//

//

//

**PRAYER FOR RELIEF**

WHEREBY PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF:

1. Compensatory and consequential damages in an amount to be proven at trial;
2. Restitution;
3. All costs of the suit incurred herein;
4. Reasonable attorneys' fees;
5. Pre and post judgment interest; and
6. Any additional or alternative relief the court deems appropriate.

Dated: March 29, 2011

DLA PIPER LLP (US)

By [signature]
JOSHUA M. BRIONES
Attorneys for Plaintiff
ROBERT P. MOSIER